Argued July 2, modified September 7, 1915.

## JONES v. SHEFLER.

(151 Pac. 463.)

**Mortgages—Title of Grantee in Deed Constituting a Mortgage—Evidence.**

1. Evidence *held* to justify a finding that the grantee in a deed intended as a mortgage acquired by purchase the absolute title to the property.

**Principal and Agent—Liability of Agent—Evidence.**

2. Defendant suggested to plaintiff that he should exchange his farms D. and F. for the property of a third person. Plaintiff gave his consent to defendant attempting to make an exchange, and recognized defendant as his agent, acting in the capacity of real estate broker. Defendant testified that he worked the deal through. By fraud, the farm D. was conveyed to a third person for the benefit of defendant. *Held*, that defendant was the agent of plaintiff, and he could not retain the benefit of the conveyance as against plaintiff, who was not materially injured because he transferred what he was willing to transfer in exchange for the property of the third person.

**Deeds—Fraud—Evidence—Sufficiency.**

3. Evidence *held* to justify a finding that a deed was procured by fraud.

**Deeds—Fraud—Ratification—Evidence.**

4. Evidence *held* not to justify a finding that a grantor, induced by fraud to execute a deed, ratified the conveyance, so as to prevent him from suing to set it aside for the fraud.

Cancellation of Instruments—Relief—Recovery for Improvements.

5.  A grantor, induced by fraud to execute a deed to a grantee for the benefit of a third person, promised the third person to compensate him for improvements made on the property, though such person was the principal in the fraud.  *Held*, that the grantor, suing to set aside the deed for the fraud, must, on obtaining relief, compensate the third person for the improvements.

[As to when the vendor may recover possession of real estate from the purchaser, see note in 107 Am. St. Rep. 722.]

Cancellation of Instruments—Suit to Set Aside Deed—Conditions.

6.  A grantor, suing to set aside a deed for fraud, subsequent to the grantee therein executing a note and mortgage on the property to a third person, who in his complaint alleges that he brings in such note and mortgage subject to the order of the court, must, to obtain relief, procure the cancellation and surrender of the note, or satisfy any judgment procured thereon, as he is not entitled both to the property and the mortgage thereon.

From Marion: WILLIAM GALLOWAY, Judge.

Department 2.    Statement by MR. JUSTICE HARRIS.

The plaintiff, M. L. Jones, was the record owner of two tracts of land in Marion County, one of which embraced about 746 acres and the other about 500 acres. For the sake of convenience the 746-acre tract will be designated as the Durbin farm and the 500-acre tract will be called the Fairfield farm. R. A. Proudfoot was the owner of property in Portland, Multnomah County, which will be referred to as the Peer Hotel. The lands owned by Jones were mortgaged for $25,000, and the Peer Hotel was encumbered with a mortgage for $35,000. J. W. Grussi and C. E. Bolds were real estate brokers doing business in Portland under the firm name of Grussi & Bolds. The defendant George C. Shefler was employed by Grussi & Bolds, and had full charge of their farm and exchange department. The defendant F. J. Eldriedge had for many years been on terms of intimate friendship with the plaintiff. The defendant Swastika Farms Company is a corporation, which was organized June 13, 1912, and for all prac-

tical purposes is the *alter ego* of Eldriedge, who soon after the incorporation of the company conveyed to it all his interest in the Durbin farm. J. H. Cummings is a near relative of Shefler, and is the holder of a mortgage for $1,875 on the Durbin farm, pretended to have been given by Shefler in May, 1912. J. C. Wolfe is the lessee of a portion of the premises from Shefler. On January 30, 1912, E. P. Lundy was holding the Durbin farm from year to year as the tenant of Jones. On January 30, 1912, the plaintiff, M. L. Jones, and the defendant Geo. C. Shefler entered into a written agreement which, so far as material to this discussion, recites:

"This agreement, made this 30th day of January, 1912, between M. L. Jones, the first party, and Geo. C. Shefler, the second party, witnesseth: The first party, on the conditions hereinafter named, hereby sells, and agrees to convey by good and sufficient warranty deed, to the second party, the following described real property, to wit: [Describing the Durbin farm and the Fairfield farm.] The consideration of this sale is the sum of $125,000. The second party, on the conditions hereinafter named, hereby sells and agrees to convey unto the first party, by good and sufficient warranty deed, the following described real property: [Describing the Peer Hotel]—at and for the sum of $125,000. Each party agrees to furnish to the other, within three days from the date hereof, an abstract of title showing, respectively, a fee-simple title free of encumbrances, except that a certain mortgage upon the real property agreed by the second party to be conveyed to the first party for $35,000, given to the Oregon Trust Company and assigned to the heir or heirs of H. W. Scott, is excepted, and also a mortgage of $25,000 given by the first party on his lands and to be discharged as hereinafter stated. Deeds of conveyance shall be executed by each party to the other, or to such party or parties as the other shall designate,

within two days from date thereof, and placed in escrow in the United States National Bank, Salem, Oregon, subject to the approval of title by the parties and the consummation of the respective engagements of the parties as herein stipulated. The first party is to pay and discharge the mortgage of $25,000 payable to Hoefer and Zorn, now an encumbrance on his property, within three days, and send the release of mortgage to the owner of said mortgage at Guthrie, Oklahoma, for his execution, depositing the money in said bank payable to his order on the receipt of said release by said bank. The second party takes the said two tracts of land owned by the first party subject to the rental contracts thereon for the year 1912, and subject also to a certain hop contract now outstanding, covering the hops grown thereon in the year 1912; he receiving the landlord's rent. The first party buys the property agreed to be conveyed by the second party subject to a certain lease thereon to the Star Brewery Company, and a lease to the Portland Bakery Company; he receiving appropriate assignments of said leases by the second party upon the passing of deed. The second party is to give the first party a mortgage for $35,000 upon the tract of land of 750 acres first above described payable two years from date thereof at 8 per cent per annum, said mortgage to be executed and delivery of note and mortgage is to be made at the time of passing deeds. Should the second party at any time during the continuance of said mortgage make sale of a portion or portions of said tract, a proportional release of the mortgage shall be made by the first party on any tract sold. * * The second party is to furnish the first party all blueprints, estimates and construction contracts relative to the construction of the building on said lots 5 and 6, called the Peer Hotel; the first party to have reasonable time to examine the same as to cost of construction. * * "

Having signified their willingness to close the transaction, Proudfoot, Shefler and Eldriedge met at the

bank on February 23, 1912, and consummated the agreement. A deed dated January 31, 1912, signed by R. A. Proudfoot and wife, conveying the Peer Hotel, subject to a mortgage of $35,000, to Ilda E. Jones, Gertrude V. Jones, Mrs. G. W. Gray and Mrs. A. M. Cannon, daughters of the plaintiff, was delivered to Jones. A deed, signed by Jones and wife, and conveying the Fairfield farm to Proudfoot was received by the latter. Shefler received a deed which conveyed to him the Durbin farm, and a note signed by Shefler and wife for $35,000, which was secured by a mortgage on the Durbin farm, was delivered to Jones. The deeds and the mortgage were recorded.

Claiming that Eldriedge was his agent, and that the deed to Shefler was induced by fraud, the plaintiff on July 26, 1912, commenced this suit for the purpose of setting aside the conveyance of the Durbin farm. The complaint alleges that Eldriedge came to plaintiff and solicited the privilege as plaintiff's agent of effecting an exchange of properties, and that for a certain consideration Jones employed Eldriedge as agent to conduct the necessary negotiations with Proudfoot for the accomplishing of the exchange; that Proudfoot was willing to exchange the hotel, subject to the $35,000 mortgage, for the Fairfield farm alone; that with full knowledge of the terms upon which Proudfoot was willing to trade, and knowing that Jones was not aware of the conditions upon which Proudfoot would exchange properties, Shefler and Eldriedge conspired together for the purpose of defrauding Jones out of the Durbin farm; that in furtherance of the fraudulent design Shefler and Eldriedge represented that Jones would be required to convey free from encumbrance both the Durbin

and Fairfield farms in exchange for the Peer Hotel;
that Shefler was a person of large financial interests,
and as such held large claims against Proudfoot; that
the demands held by Shefler were of such consider-
able extent that the Peer Hotel was under the imme-
diate direction and control of Shefler; that as a re-
sult of the proposed exchange Proudfoot would only
acquire the Fairfield farm, which was equal in value
to all the equity that remained to Proudfoot in the
hotel, and that the Durbin farm would have to be
deeded to Shefler to satisfy the claims held by Shefler
and his associates against Proudfoot; that the repre-
sentations were false; that, relying upon the state-
ments made by Shefler and Eldriedge, the plaintiff
deeded the Fairfield farm to Proudfoot and conveyed
the Durbin farm to Shefler, who was employed by and
acting as the agent of Eldriedge. The complaint con-
cludes with a prayer that Jones be decreed to be the
owner of the Durbin farm, that the mortgage from
Shefler to Cummings be canceled, that the deed from
Eldriedge to the Swastika Farms Company be an-
nulled, and for equitable relief.

The defendant Shefler answered by denying the
charge of fraud, and alleging that Eldriedge does not
own any interest in the Durbin farm, and that the
Swastika Farms Company wrongfully claims to own
the land. For a separate answer Shefler alleges that
the Peer Hotel was worth $125,000, and that the Dur-
bin and Fairfield farms were together of the value of
$125,000, and that the plaintiff agreed to and did trade
the two farms for the Peer Hotel; that the plaintiff
was to convey the farms to such persons as might be
named by Shefler, who likewise was to transfer the
hotel to such persons as Jones might designate; that

77 Or.—19

deeds were executed and delivered pursuant to the
agreement; that Jones relied upon his own judgment,
after a personal inspection of the Peer Hotel, and
was not deceived or defrauded by Shefler. The an-
swer filed by Shefler further avers that immediately
preceding the commencement of this suit Eldriedge
and Jones conspired together to defraud Shefler out
of the Durbin farm. Shefler asks for a decree declar-
ing him to be the owner of the land, and that the clouds
created by the plaintiff and other defendants be re-
moved. Eldriedge and the Swastika Farms Company
answered jointly. They deny the accusations of fraud
made by Jones in the complaint, and assert that
Shefler was acting as agent and trustee for Eldriedge,
and that Shefler wrongfully claims to own the land.

For a separate answer to the complaint Eldriedge
and the Swastika Farms Company aver that, while
the title to the Fairfield farm appeared of record in
the name of Jones, the fact was that Eldriedge owned
an undivided one-half interest in that property; that,
while the deeds purported to convey all the Fairfield
farm to Jones, they were only intended to convey an
undivided half in fee, and to operate as a mortgage
on the other one-half interest to secure certain ad-
vances made by Jones to Eldriedge, and amounting
to about $15,000 on January 30, 1912; that having
learned that Proudfoot desired to exchange the Peer
Hotel for acreage, Eldriedge communicated the in-
formation to Jones, who inspected the Peer Hotel,
and, having decided that it was worth $120,000, he
expressed a willingness to trade by giving for the
Peer Hotel the Durbin farm, valued at $90 per acre,
and the undivided one-half of the Fairfield farm,
valued at $22,500, and to cancel the indebtedness which

Jones held against Eldriedge in the sum of $15,000; that afterward, in exchange for the Peer Hotel, Jones conveyed the Fairfield farm to Proudfoot, and to Shefler, who had been employed by Eldriedge to aid in closing the trade, the Durbin farm was deeded in trust for Eldriedge, while the debt due from Eldriedge to Jones was, as a part of the consideration for the exchange, wiped out and canceled. It is further averred that at the time of conveying the Durbin farm Jones knew that the title was taken by Shefler in trust for Eldriedge, for the reason that Shefler had represented to Eldriedge that the former could through eastern connections furnish the necessary money to enable Eldriedge to improve the land, and that Shefler would advance moneys to the amount of $10,000. It is also set forth that, immediately after the trade was closed, Eldriedge, with the knowledge and consent of Jones, paid Lundy $1,000 for a cancellation of the lease held by Lundy, and that Eldriedge then went upon the premises and made improvements valued at $6,000. Eldriedge and the Swastika Farms Company further alleged that Jones ratified the conveyance of the Durbin farm to Shefler, because in June, 1912, Jones loaned to Eldriedge $1,000, and took as security shares of stock in the Swastika Farms Company, and also because in April, 1912, Eldriedge made application to Jones for a loan of $5,000, and with the understanding that the farm would be mortgaged to secure such loan the plaintiff by indorsement procured for the use of Eldriedge the sum of $5,000, which the latter secured by causing Shefler to execute a mortgage on the farm. For the purpose of obtaining affirmative relief against Shefler, it is alleged in the answer of Eldriedge and Swastika Farms Com-

pany that Shefler had been employed and paid $1,250 by Eldriedge for assisting in bringing about the exchange of properties, and that the Durbin farm was conveyed to Shefler in trust for Eldriedge, the former agreeing to advance $10,000 to enable the latter to improve the land; that Eldriedge has since conveyed all his interest to the Swastika Farms Company; and that Shefler has failed to comply with the demand of the corporation to convey the land to it. The answer prays that Shefler be decreed the trustee of the Swastika Farms Company, and that he be required to transfer the land to the corporation, and that the Cummings mortgage be canceled.

By appropriate replies the plaintiff traversed the defenses set up by the answering defendants. Lundy and Cummings made no appearance. The trial commenced December 15, 1913, and on February 27, 1914, terminated in a decree which cancels the deed from Jones to Shefler, annuls the conveyance from Eldriedge to the Swastika Farms Company, sets aside the mortgage from Shefler to Cummings, and awards to the Swastika Farms Company a judgment against Jones for $11,000, on the theory that Eldriedge had paid to Proudfoot the sum of $5,000 as a part of the consideration for the exchange of the properties, improvements to the extent of $6,000 had been made, and a commission of $5,000 should be paid by Jones; the three sums aggregating $16,000, from which $5,000, the amount of the loan procured by Jones, was deducted, leaving a balance of $11,000. The plaintiff appealed from that portion of the decree which awarded a judgment against him. Shefler did not appeal, but Eldriedge and the Swastika Farms Company appealed from the whole decree.    MODIFIED.

For appellant there was a brief over the names of *Mr. John H. McNary* and *Mr. A. M. Cannon,* with an oral argument by *Mr. McNary.*

For respondents there was a brief over the name of *Messrs. Murphy, Conley & Deneffe,* with oral arguments by *Mr. Arthur A. Murphy* and *Mr. J. A. Conley.*

MR. JUSTICE HARRIS delivered the opinion of the court.

Briefly stated, the facts present a situation where Proudfoot owned the Peer Hotel and Jones possessed two farms, one of which is called the Durbin farm and the other is known as the Fairfield farm; Proudfoot deeded the hotel to Jones, with an encumbrance of $35,000. Jones transferred the Fairfield farm to Proudfoot, and conveyed the Durbin farm to Shefler, who then gave to Jones a note for $35,000, secured by a mortgage on the land. As we read the complaint, the version as given by the plaintiff is that Eldriedge was acting as the agent of Jones, and Shefler was employed by Eldriedge. One farm was conveyed to Proudfoot, and one to Shefler, with the belief that the Fairfield farm paid Proudfoot for his remaining equity in the hotel, and the Durbin farm satisfied the large claims held by Shefler against Proudfoot and the hotel, when in truth Shefler did not hold any claims at all against Proudfoot, and the Durbin farm was therefore fraudulently acquired by Shefler for the benefit of Eldriedge, who was at all times the agent of Jones. This suit in no way affects the transfer of the Fairfield farm to Proudfoot, and the only land involved in the litigation is the Durbin farm.

Epitomizing the story told by Shefler in his answer: He claims to be owner of the land, denies that El-

driedge possesses any interest entitled to recognition and rests his claim of ownership on the ground that he made a contract with Jones, who, after making a personal inspection of the hotel property, conveyed only that which he agreed to convey, and received all that he contracted for, and that therefore Jones was not injured. Eldriedge and the Swastika Farms Company plead their claim to the land by asserting that, while Jones had a deed to the Fairfield farm, he only owned an undivided one half of that property, and held the other half as security for about $15,000 which Eldriedge owed him; that Jones conveyed the Fairfield farm to Proudfoot free from encumbrance, and paid Eldriedge for his equity in that property by transferring the Durbin farm to Shefler for the benefit of Eldriedge, and then taking a mortgage back for $35,000. Eldriedge accounts for the deed being made to Shefler by saying that the latter was to advance to the former $10,000, which Eldriedge planned to use in the improvement of the property. Eldriedge and the Swastika Farms Company further contend that, regardless of whether the transaction was fraudulent or honest, Jones ought not to be permitted to accuse Shefler and Eldriedge of wrongdoing, because with a full knowledge of all the facts (a) Jones procured a loan of $5,000 for Eldriedge and as security took a mortgage on the farm; (b) Jones loaned to Eldriedge $1,000, and received shares of stock in the Swastika Farms Company to secure the loan; and (c) Eldriedge and his grantee the corporation made improvements to the amount of $6,000.

A recital of the conflicting claims of the litigants at once reveals that the plaintiff's right to relief depends upon whether Eldriedge was his agent; that Eldriedge

predicates his claims upon the contention that he had an equity in the Fairfield farm, and that Jones held the title to an undivided half to secure an indebtedness; and that Shefler simply stands on the agreement with Jones, and fortifies himself behind the assertion that Jones looked at the hotel, and then gave all, but not more, than he agreed to give, and received all that was promised to him.

1. The question first demanding attention concerns the claim made by Eldriedge that Jones held the legal title to one half of the Fairfield farm to secure an indebtedness of about $15,000. If Edriedge had an equity in the property conveyed to Proudfoot, then he has laid a substantial foundation for his contention that the Durbin farm, subject to the $35,000 mortgage, paid for his equity in the Fairfield farm; but if he had in fact sold all his interest to Jones, and if it was understood by the parties that Jones did not hold the title as security only, then the very basis of the contention made by Eldriedge is swept away, while the position of Jones is materially strengthened. We shall therefore relate some of the transactions involving the Fairfield farm. Eldriedge had been litigating with John Hoefer and Casper Zorn over the Fairfield farm and a tract of 228 acres known as the Waconda farm (see *Eldriedge* v. *Hoefer,* 52 Or. 241 (93 Pac. 246, 94 Pac. 563, 96 Pac. 1105), during which time Jones had advanced money to Eldriedge, and for the purpose of securing the advances already made as well as such as might subsequently be furnished, Eldriedge executed a quitclaim deed on April 11, 1908, conveying to Jones all interest in the Fairfield and Waconda farms. On January 16, 1909, Eldriedge executed and delivered to Jones an instrument referred

to in the transcript of testimony as the confirmatory deed. After reciting that the quitclaim deed was intended as a mortgage, the confirmatory deed reads thus:

"Whereas, the said M. L. Jones, in addition to the sums of money loaned to me as aforesaid, has lately paid, satisfied and discharged an indebtedness owing by me to divers and sundry persons, and has assumed and become obligated to pay said indebtedness to the said John Hoefer and Casper Zorn, and made additional loans and advances to me, all as payments on an agreed purchase price of said lands, and all sufficient in amount to equal the value of my interests in the said lands hereinbefore described, under an agreement that all my right, title, interest and estate, both legal and equitable, and particularly my equity of redemption in and to said above-described lands, and every part and parcel thereof, should absolutely pass to and vest in said M. L. Jones, by virtue of the conveyance to him of August 21, 1908, divested of all claims to ownership or equity of redemption therein by me, and under the further agreement that said deed of August 21, 1908, should be supplemented by my acknowledgment and confirmation of the same as such absolute deed of conveyance by deed of confirmation executed according to the usual formalities of the law: Now, therefore, I, the said Freeman J. Eldriedge aforesaid, in fulfillment of the foregoing promises, considerations and agreements, do hereby grant, bargain, sell, remise, release, convey and confirm unto the said M. L. Jones by my said deed of quitclaim executed and delivered to him on the 21st day of August, 1908, as aforesaid, as well as by these presents, all my right, title, interests and estate, both legal and equitable, and all my equity of redemption from any and all persons whomsoever, in and to the above-described lands, tenements and hereditaments, and every part and parcel thereof, to have and to hold the same unto the said M. L. Jones, his heirs and assigns,

forever, divested of all claim or claims of ownership, present or remote, absolute or contingent, by me, and I hereby direct the said John Hoefer and Casper Zorn to convey the legal title to said lands to the said M. L. Jones.''

Jones claims that it was agreed that the confirmatory deed was to pass the absolute title to all the Fairfield farm on the basis of $70 per acre, making $35,000 as the purchase price of the 500 acres. Eldriedge contends that the confirmatory deed was designed to convey to Jones an undivided one half of the Fairfield farm in payment of $17,500 of the indebtedness, and the other undivided one half was to be held as security for such indebtedness as remained over and above the $17,500. Both Jones and Eldriedge state that the land agreed to be conveyed to Jones was figured at $70 per acre, but they are not agreed upon how much interest in the land was transferred to Jones. On the day of the execution of the deed, but before it was signed, a memorandum was prepared showing the moneys previously paid by Jones, as well as debts due from Eldriedge to third parties, aggregating $33,313.33. The memorandum is in evidence, and it shows that Eldriedge over his signature authorized Jones to pay the outstanding indebtedness, which included $24,671.90 due Hoefer and Zorn, and to credit the payments ''on the purchase price of the Eldriedge Fairfield farm.'' This identical memorandum shows that the parties figured $1,686.67 as the difference between $35,000 and $33,313.33. Eldriedge having stated that he wanted a chance to get half of the Fairfield farm back, Jones told him that he would give a writing by which Eldriedge could purchase half for $17,500; and such an instrument was accordingly prepared, but was not signed, because Eldriedge

preferred not to do so, whereupon Jones told
Eldriedge that if within a reasonable time the lat-
ter produced $17,500 he could have half of the
place. Jones paid all the indebtedness, aggregating
$33,313.33, and went into possession of the premises.
Jones went to Portland on June 8, 1909, at the request
of Eldriedge, and found him confined to his room with
illness. Eldriedge wanted the balance due on the
Fairfield farm, whereupon Jones gave his note for
$1,686.67, to the former, who in turn signed and gave
to Jones a writing as follows:

"Portland, Oregon, June 8, 1909.
"Received from M. L. Jones $1,686.67, balance due
on purchase price of Eldriedge Fairfield farm of 500
acres, and verbal option to purchase only part of said
farm is hereby canceled.
"F. J. ELDRIEDGE."

Attached to this writing is a sheet of paper, upon
which appears an itemized list of the sums paid by
Jones, aggregating $33,313.33, and also showing that
for the second time the parties figured $1,686.67 as the
difference between $35,000, the purchase price of 500
acres at $70 per acre, and $33,313.33, the total amount
already paid. It is true that Eldriedge testified that
the amounts figured were too large, but this conten-
tion is not entitled to any consideration.

It is possible that different persons might disagree
as to the legal effect of the quitclaim and confirmatory
deeds, when considered in connection with the con-
temporaneous oral agreements; but, if the testimony
of sworn witnesses and what appear to be irrefutable
writings can be relied upon at all, it would seem that
there could be no escape from the conclusion that both
Jones and Eldriedge understood that the confirm-
atory deed passed an absolute title to all the Fairfield

farm, especially when supplemented by an understanding that the transaction was completely closed when the note was given on June 8, 1909. The writing which was prepared, but not signed, when the confirmatory deed was delivered, affirmed that Jones held the Waconda farm in trust for Eldriedge, and at the same time, recognized that Jones had purchased all the Fairfield farm. Jones never at any time claimed to own the Waconda farm, and until the execution of the confirmatory deed held both farms as security for the debts paid by him for Eldriedge; but, when Eldriedge's indebtedness to Jones had been paid by the conveyance of the Fairfield farm, the latter no longer claimed any interest in the Waconda farm, and the fact that Jones, without the payment of any consideration, conveyed the Waconda farm on June 17, 1909, to Ben W. Olcott, for the purpose of securing certain advances made by Olcott to Eldriedge, strengthens rather than weakens the claim of Jones that he had purchased all the Fairfield farm, because otherwise, in all probability, he would have been inclined to retain some claim to the Waconda farm as additional security.

It is true that Eldriedge told J. W. Grussi and C. E. Bolds that he had an equity in the Fairfield farm. While Jones denies making the statements, the evidence shows that in June, 1912, at three different places, he either made evasive statements or admitted that Eldriedge had possessed an interest in the Fairfield farm. On these occasions, however, it was thought that Shefler could be persuaded to relinquish his claim to the land by convincing him that Eldriedge had had some interest in the 500 acres conveyed to Proudfoot. Both Eldriedge and Jones might have

considered that the option to repurchase, verbally given to Eldriedge, vested some interest in him, and so, too, Cannon may have had the same idea when suggesting that a suit would be necessary to divest Eldriedge of all interest. Shefler concedes that at an earlier date, and after the $5,000 loan was made, Jones told him, in answer to a direct question, that Eldriedge did not own an equity in the Fairfield farm. It is not reasonable to believe that either Eldriedge or Jones ever thought that the former had anything more than a right to repurchase, because the conduct of the parties, their declarations to each other, and the convincing writings all point to the conclusion that the payments made by Jones were recognized and intended to operate as a purchase of the absolute title to all the 500 acres. The very foundation of the claim made by Eldriedge is that Jones only owned half and held the other half as security; and when the essence of his contention is conclusively disproved, not much remains for him to stand upon.

2. The next phase of the case presented for consideration is the question of agency. Eldriedge is the person who suggested to Jones that he exchange his farms for the Peer Hotel. In January, 1912, Eldriedge asked Jones if he would trade his two farms for the hotel, and the former stated that he thought he could negotiate a transfer. Eldriedge declared that he would not expect any commission directly out of the exchange, but he would be satisfied if Jones would agree to permit him to exchange the hotel, when acquired by Jones, for $100,000 in cash and $100,000 in timber lands, the deal for which he said was practically made and could be consummated before the fall of the year, and out of which he wanted a fourth of the

profit. Jones gave his consent, and from that time on recognized and regarded Eldriedge as his agent, acting in the capacity of a real estate broker. Eldriedge testified: "I think I worked the whole deal through." On these facts Eldriedge cannot retain the land conveyed to Shefler, if Jones did not know that such conveyance was designed by Shefler and Eldriedge to be for the benefit of the latter; and it would make no difference that Jones was not materially injured, because of having transferred exactly what he was willing to give for the hotel: *McNiel* v. *Holmes, ante,* p. 165 (150 Pac. 255).

3. The next inquiry is whether Jones knew that the deed to Shefler was for the use of Eldriedge, and whether Jones was the victim of fraudulent practices. Proudfoot, who died before the time of that trial, received for his hotel the Fairfield farm, and nothing more. He was willing to trade, and did exchange, his hotel, subject to the $35,000 mortgage, for the Fairfield farm and he received nothing more. Eldriedge claims to have paid $5,000 to Proudfoot; but he did not even attempt to account for a written agreement which he asserted was made with Proudfoot. He produced no receipt from Proudfoot. He did not call any person connected with the Bowers Hotel, where he claims to have obtained part of the money paid to Proudfoot, and he did not even fortify his own testimony by calling Brown as a witness, from whom he declared he received the remainder paid to Proudfoot, although it appears in the record that Brown was in the courtroom. Moreover, it is conclusively established that Proudfoot paid a commission of $1,500 on account of the exchange, by giving his note for $750 to Grussi & Bolds and a like note to Shefler; and the notes were

given because Proudfoot did not have any ready money. Eldriedge represented to Jones that Shefler was a capitalist, and that Proudfoot would be obliged to follow any directions given by Shefler, because Proudfoot was heavily indebted to Shefler; and Jones was also told that the Fairfield farm would be conveyed to Proudfoot as the purchase price of his equity remaining in the hotel, but that the Durbin farm must be conveyed to Shefler to pay the demands be held against Proudfoot and the hotel. The contract was made with Shefler, and not with Proudfoot, because of the explanation that the latter would be obliged to do as Shefler directed. Jones claims that both Shefler and Eldriedge advised him to stay away from Proudfoot, for the reason that the deal might be interfered with. That Jones did not see Proudfoot is corroborated by the circumstance that no witness, except Eldriedge, even intimates that Jones was ever seen with Proudfoot until all the parties met at the bank in Salem when the deeds were exchanged. The truth is that Shefler was not a capitalist, and Proudfoot did not owe him a single cent. The oral negotiations contemplated that all the land should be freed from encumbrances; but, before reducing the contract to writing, Eldriedge informed Jones that the parties who held the $35,000 mortgage would not accept the money because the note had two years yet to run, and for that reason it was agreed that Shefler would give a mortgage on the Durbin farm to indemnify Jones for the mortgage on the Peer Hotel.

Soon after the deeds were exchanged, Eldriedge took possession of a part of the Durbin farm, and explained to Jones, as well as to others, that Shefler had agreed to sell him 200 acres at $100 per acre. El-

driedge admitted, as a witness, that, when a man working on a portion of the land wanted to buy, he told the man to go to Shefler. Shefler had been employed by Eldriedge to assist the latter in conducting the negotiations, and Eldriedge had agreed to pay Shefler $1,000 for his services; but apparently Shefler exacted more after the title had been transferred to him, because he refused to convey to Eldriedge. Shefler admitted to Grussi that he declined to make a deed because he was going to get the commission, and more too. He stated to both Grussi and Boldts that he was holding the land in trust for Eldriedge; and although he alleges in his answer that he owns the farm, no claim of that character appears from his testimony. After Shefler refused to make a conveyance to Eldriedge, the latter, at the suggestion of A. M. Cannon, a son-in-law of Jones, caused a creation of the Swastika Farms Company, a corporation, and for the purpose of clouding the title, so as to prevent Shefler from selling to an innocent purchaser, Eldriedge conveyed all his interest to the corporation. On July 25, 1912, the Swastika Farms Company, as the successor of Eldriedge, commenced a suit against Shefler in Multnomah County. The complaint which was sworn to by Eldriedge, alleges that on January 31, 1912, Shefler by a parol agreement leased the Durbin farm for a period of two years to Eldriedge, and as a part of the agreement Eldriedge was given an option to purchase the property for $37,000, which could be paid in cash, or by assuming the $35,000 mortgage held by Jones and paying $2,000 in cash, and that, relying upon the verbal agreement, Eldriedge went upon a part of the farm and made permanent improvements. When testifying as a witness, Eldriedge stated that he caused the Durbin farm to be transferred to Shefler, because

the latter had agreed to loan him $10,000 with which to improve the property. Soon after Shefler's refusal to convey to Eldriedge, the latter stated that it would be necessary to prove that he had possessed an equity in the Fairfield farm in order to secure the title from Shefler. The Fairfield and Durbin farms, aggregating 1,250 acres, were figured at $100 per acre, making an aggregate of $125,000, which was equal to the price placed upon the Peer Hotel. Assuming that Jones held one half of the Fairfield farm as security only, then he had $25,000 worth of property to secure an indebtedness of $17,500, leaving an equity of $7,500 remaining in Eldriedge. Figuring the Durbin farm at $100 per acre, the total value was $75,000, and after deducting the $35,000 mortgage, according to the contention of Eldriedge, he then received an interest valued at $40,000 for an equity worth only $7,500. It is not reasonable to believe that Jones would have entered into such an agreement. The evidence convinces us that Jones was induced by fraud to convey the Durbin farm to Shefler, and our belief in the correctness of this conclusion is strengthened when we look at the kaleidoscope of contradictions presented by the variant oral and written declarations made by Eldriedge and the shifting positions taken by him.

4. It remains to determine whether Jones affirmed the conduct of Eldriedge and Shefler by securing the $5,000 loan and making the $1,000 loan. Jones met Shefler in Salem about April 27, 1912, pursuant to the latter's request, and at that time Shefler stated that he desired to borrow $5,000 for the purpose of making improvements on the farm. Jones said that he did not have any money to loan. Some negotiations were had with Ladd & Bush, bankers, but the bank declined to

make a loan on a second mortgage; the security offered being a mortgage on the Durbin farm, subject to the prior $35,000 mortgage. It was finally agreed, however, that the bank would make the loan if Shefler would give his note and mortgage to Jones and the latter would add the security of his own financial worth by indorsing the note to the bank. The note and mortgage were given as agreed, and Jones immediately indorsed the note to Ladd & Bush, who then loaned the money. Eldriedge testified that he made arrangements with Jones for the money; but the latter swore that he knew only Shefler in the transaction, and did not know that Eldriedge had any interest in the loan until sometime afterward. Jones is to some extent corroborated by Shefler, who stated that nothing was said by the former to indicate that Jones had talked with Eldriedge. Jones did not make this loan direct to Shefler, but he served only as an instrumentality to enable Shefler to secure the money from the bank. Prior to that time Eldriedge represented to Jones that he had a contract to purchase 200 acres from Shefler at $100 per acre. Jones at that time did not know that the land had been procured for the benefit of Eldriedge, nothing had occurred to charge Jones with notice of the facts, and consequently the $5,000 loan does not furnish any foundation for a ratification or an estoppel.

In July, 1912, Eldriedge gave his note for $1,000 to Jones, securing it with a chattel mortgage on some personal property used for operating the farm; and Eldriedge also delivered to A. M. Cannon 2,500 shares of the capital stock of the Swastika Farms Company to be held by him in trust and for the purpose of further securing the $1,000 note. The advisability of taking the stock was discussed by Jones and his ad-

77 Or.—20

viser, Cannon. Eldriedge wanted to throw in the
stock, and it was finally taken, although Cannon told
Jones that it was not worth anything. The rule that
the oral admissions of a party ought to be viewed with
caution (Section 868, subd. 4, L. O. L.) is aptly illus-
trated by the record in this case. Thoroughly credible
witnesses employ different language in detailing state-
ments made by Jones in several conversations: and the
extent of admissions ascribed to Jones differs accord-
ing to the language used by the respective witnesses.

The attorneys who prepared the complaint for El-
driedge in the case of *Swastika Farms Co.* v. *Shefler*
talked freely and without reservation to Jones; but,
taking the complaint prepared by them in that case
as an index of their understanding of the facts, they
had been told that Shefler had only leased the property
to Eldriedge with the option to purchase, which is a
situation quite different from the position taken by
Eldriedge at the trial. If the $1,000 loan, the state-
ments made by Jones, and the information given him
by the attorneys for Eldriedge stood alone and with-
out further explanation, there might be more weight
in the contention that Jones did not act with diligence
and promptly disaffirm the conveyance of the Durbin
farm. Cannon testified that, when Eldriedge told him
that it would be necessary to prove that the latter had
an equity in the Fairfield farm, his suspicions were
aroused, and he informed Jones that it would be neces-
sary to proceed with caution in order to ascertain
whether the transaction was as represented when the
exchange was made. It will be remembered, too, that
Eldriedge had told Jones that the former had a con-
tract from Shefler for 200 acres at $100 per acre, and
when Eldriedge first complained to Cannon, or Jones,
his grievance was because Shefler had refused to keep

his contract. Jones stated that, as between Shefler and Eldriedge, he would like to see the latter receive whatever belonged to him. And at no time after the refusal of Shefler to make a deed did Jones do or say anything that would even tend to operate as an affirmance of the deed to Shefler, when considered as a purchaser of all the land. On behalf of Jones there is evidence that it was understood that he and Eldriedge would together endeavor to wrest the title from Shefler, and, if successful, Eldriedge could depend upon Jones to do the fair thing and settle for the improvements made by Eldriedge. This contention finds support in the fact that Jones told a tenant to pay rent to the Swastika Farms Company, and that Jones would continue to act as manager of the farm; and it is further strengthened by the uncontradicted fact that Jones and Eldriedge continued to maintain their friendly relations even after the commencement of the suit, because it was Jones who loaned to Eldriedge $1,300 in August, 1912, as well as $100 on one occasion, and $60 at another time. It is a significant fact, too, that the answer filed in this suit by Shefler charges Jones and Eldriedge with having entered into a conspiracy to divest Shefler of his alleged title to the farm. Subsequently Eldriedge was offended because neither Jones nor Cannon would loan him any more money; and the former appears to have acted in harmony with Shefler at the trial. Jones said that he did not really know all the facts until about one week before he commenced this suit. For the reasons enumerated, we conclude that Jones is still in a position where he can complain of the fraud perpetrated upon him.

5. Eldriedge was made to understand that Jones would do the fair thing and settle for the improvements made by Eldriedge; and, notwithstanding the

fact that Eldriedge was the principal in a fraud practiced upon Jones, it would nevertheless seem to be equitable to require Jones to keep the promise made to Eldriedge. The value of the improvements is estimated to be from $4,000 to $7,000. Fifty acres were planted to peach trees, 39 acres to loganberries and 45 acres to hops. The $1,000 loan was for the purpose of paying for improvements. Shefler kept at least $1,000 of the $5,000 borrowed from Ladd & Bush, and Eldriedge used the remainder for improvements. Shefler should not be permitted to profit from the transaction. Except as to the $1,000 retained by Shefler and not used for improvements, the $5,000 note and mortgage should be taken care of by Jones. If Jones still has possession of the $1,000 note, he will be required to surrender it to Eldriedge; and if the note has passed to the hands of a third person, Jones shall pay the note and cancel it. We believe a fair settlement for the improvements placed on the property will be accomplished by following the directions here given.

6. There is yet another feature of the case presented by the abstract and briefs filed by Eldriedge and the Swastika Farms Company. After the Circuit Court had rendered a decree, Eldriedge and his corporation filed a motion for an order to vacate the decree. The motion was accompanied by an affidavit showing that the United States National Bank of Salem, as holder of the Shefler $35,000 note and mortgage, had commenced a foreclosure suit. Later on the defendants filed a second motion, which recited that the bank had reduced the $35,000 note and mortgage to a judgment and decree. The court overruled both motions. The ruling of the court on the motions is not assigned as error; and, moreover, the defendants did not offer to file any proposed answer reciting the foreclosure suit

as a waiver or estoppel. In his complaint the plaintiff alleges that he brings the $35,000 Shefler note into court subject to its orders. Jones cannot have both the land and the $35,000 note signed by Shefler. If for any reason the note has been reduced to a judgment, Jones must cause it to be satisfied immediately upon the filing of the mandate in the Circuit Court. If the note has not been transformed into a judgment, Jones must at once cause the note to be canceled and surrendered. If Jones is not willing to comply with the conditions imposed, the conveyance to Shefler will not be disturbed, because as between Eldriedge and Shefler a court of equity will leave the controversy where it was first found. Jones is entitled to costs and disbursements in both courts.

The evidence in this case is voluminous. The controversy hinges upon questions of fact only. The rules applicable to the facts are fundamental, and are as old as equity jurisprudence. It is not necessary to consider or apply any new or debatable legal principles. The discussion of the evidence is of interest to no one except the parties to this litigation. Although the law requires a written opinion, and directs that it be printed, still no useful purpose is subserved by doing so. The writer attempts to express only his own views by pointing to this suit as a concrete illustration of the need for such a change in the law governing this court as will permit oral decisions, after giving notice to the parties, so as to enable them to be present, in all cases where the opinion will not be useful as a precedent.

The decree of the lower court is modified.

MODIFIED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE EAKIN and MR. JUSTICE BEAN concur.